HILLMAN *v.* HILLMAN.

4-5894 138 S. W. 2d 1051

Opinion delivered April 8, 1940.

*A. G. Meehan* and *John W. Moncrief,* for appellant.

*Earl J. Lane,* for appellee.

GRIFFIN SMITH, C. J. Section 4383 of Pope's Digest directs that divorce proceedings "shall be in the county where the complainant resides, and the process may be directed in the first instance to any county in the state where the defendant may then reside."

July 13, 1939, Fred E. Hillman filed complaint, alleging that he was a resident of Garland county; that he and Grace Hillman were married in 1903; and that since November 13, 1935, they had not lived together. They had only one child—a grown daughter. The prayer was that the bonds of matrimony be dissolved.

July 28 the wife entered a special appearance, moving that the cause be dismissed. She alleged her husband was not a resident of Garland county; that his pretended abode was established for the sole purpose

of avoiding jurisdiction of the chancery court of Arkansas county, where he in fact resided; that he owned 1,500 acres of real property; that he abandoned his wife in Arkansas county and there attempted to procure a divorce, but was unsuccessful, and that he had refused to comply with the court's orders awarding alimony. The motion was overruled.

Hereafter in this opinion the wife will be referred to as appellant, and the husband as appellee.

Appellant filed suit for divorce in Arkansas county in 1936, alleging desertion and indignities. Appellee filed cross-complaint, in which he alleged indignities, and asked for divorce. On application by appellant for costs, etc., $150 was allowed as temporary suit money and attorney's fee, and $100 was decreed as maintenance.

In June, 1937, appellant amended her complaint by dismissing the prayer for divorce and by asking for permanent maintenance. On the amended complaint appellant was allowed $125 per month. Appellee was required to pay $100 additional as attorney's fee, and to pay costs. There was an order that appellee have use of the family residence at Almyra.

May 1, 1939, the chancery court of Arkansas county found that appellee's delinquent payments were $2,150. The amount was reduced to $900. The order was that $250 be paid June 15 and that the balance of $650 be paid November 1. The monthly allowance was fixed at $65 instead of $125. In appellant's brief it is stated: "Appellee is now in default in the sum of $845 and has not paid all costs of the Arkansas chancery court, and for a long period appellant has been borrowing money. . . . She is ill and under the care of a physician, and [was] unable to attend court [in Garland county]."

The only issue to be determined here is whether appellee is a *bona fide* resident of Garland county within the meaning of the statute.

Appellee testified he had lived in Hot Springs since June 4, 1939. He went there because it was a better place to live as compared to Almyra and Stuttgart. His wife made social conditions impossible in Arkansas

county. He was engaged in the rice business, with an office at 245 Court street. Expected to remain in Hot Springs. Exhibited electric bill, bill for fuel oil, and bank statement. Purchased city license in Hot Springs for his automobile and assessed personal property there. Procured reduction in rent on assurance to his landlady that he intended to be "a permanent citizen."

On cross-examination appellee said: "I am in Hot Springs looking after my hunting next fall. . . . I came to Hot Springs for social reasons and to get hunters. Last year made $600 hunting and year before last $300 or $500. . . . My daughter mortgaged her property to take care of my wife. My wife has not mortgaged the property that came from her mother's estate. It seems to me my wife should mortgage that property. It rents for $20 a month."

Appellee insisted it did not cost as much to live in Hot Springs as in Stuttgart: "If a landowner lives near his rented farm he has to do a hundred odd jobs and gets no more rent than one in Chicago. Here [in Hot Springs] I get time to study about other things and will finally study out things here that I don't get to do there at home—business deals, etc."

When asked "Just what is there in Stuttgart that prevents you from exercising your mind?" appellee replied: "A whole lot of it is my wife's torment. Every time she hears of my being anywhere in an official gathering she goes to some of the bunch and bemeans me—like going to the beauty parlor and putting her talk in about what I have done."

Counsel for appellant urged that details of such comment be given, whereupon appellee invoked the rule of evidence, saying:—"Well, it would be hearsay if I told you, because I didn't hear her say it."[1]

---

[1] When pressed for names of those to whom his wife was supposed to have talked, appellee replied: "I couldn't tell you. There is rumor." The court ruled the witness should answer, and he replied: "She made them in front of Ruckstein's store, Carlson's Beauty Parlor, and the A. & M.—she talked to the lady at Ruckstein's store who died the 7th of May. Q. When did this party tell you about it? A. She didn't tell me—I said it was hearsay. I can't give you the name of one person that told me. Q. Who was it at the beauty parlor that Mrs. Hillman said anything to? A. I don't know where that came from, either, and I don't know who she was talking to. . Who was it she was talking to at the A. & M. Grill? A. I don't know."

The following observation formed a part of appellee's testimony: "I think social conditions are a lot better in Hot Springs than around Stuttgart where [Mrs. Hillman] goes to the people I associate with and tries to tell them she is my legal wife and that they have no right to associate with me. If she does those things it hurts a fellow in social conditions. It is hard to get in good society where a woman is doing that kind of stuff."

In response to the question, "Do you have a lady friend?" appellee replied: "I have several lady friends. I try to be sociable with all the ladies—some nice ladies in Hot Springs. I find out in Hot Springs is one of the best places for sociable women friends."

"Q. Mr. Hillman, did you testify at Pine Bluff on the first of June that you daily visited one particular sweetheart and *daily* took her driving? A. I don't remember whether I did or not. Q. Don't you recall that you testified you visited her every day unless some exception out of the ordinary came up, and that you *daily took her driving?* A. I don't remember. I did date a lady in Stuttgart, but not daily. That lady still lives in Stuttgart, and my relations with her have not been broken off. There is no difference in my fondness for her, and I still go over to see her. . . . I am not testifying who she is."

Mrs. A. T. Pierce testified that she operated an apartment house at 245 Center street, in Hot Springs; that appellee had lived there since June 4:—"He said he wanted to live there permanently, and I gave him special rates. He moved a truck load in. He has been there most of the time, but goes away to his farm. He pays by the month. I have no definite contract with him, and do not know what his intentions are. His office is just his room at my place. He has a desk, safe, and wardrobe."

It was stipulated that Mrs. Hillman, in response to her husband's petition of May 21, 1939 (in which he sought reduction of temporary alimony) stated she was

willing to resume the marital relationship, and had always been hopeful appellee would return home.

Irene Hillman, daughter of appellant and appellee, testified her father had been a rice farmer for many years:—"I have gone with Father to the fields and am familiar with rice farming. It is better in every way for the landowner to be close to the fields—so many things can go wrong on a rice farm. Irrigation wells need constant attention. So do dams and canals and reservoirs. . . . The last time I saw Papa and [Mrs. X.] together was November 11, 1939. They were in a car between Stuttgart and Almyra, going toward the farms. Since the fourth of June I have seen them pass through Little Rock three times. They have passed by the place I work in Little Rock a number of times in the past eighteen months. Prior to that time I had seen them in Little Rock. Papa was loading bundles in his car for her. I have seen them in Blass' store and at Pfeifer's. He paid the bills a number of times. . . . Mother tried to mortgage the Biscoe property, but no one would lend money on it. I mortgaged my property for her. I work about twelve hours a day. . . . Father owes me $700. I needed it for Mother and myself and asked Father for it several times. He said if he paid me I would let Mother have it, and she would not agree to a divorce as long as she had anything to live on."

Was appellee's residence in Hot Springs colorable?

In *McGill v. Miller,* 183 Ark. 585, 37 S. W. 2d 689, it was said that ". . . a man has the absolute and unqualified right to change his place of abode when he pleases, for any reason which prompts him so to do, and that he does change his place of abode when he removes from one place, with the intention of abandoning it as his place of abode, to another place, where he expects to abide, without having the intention of returning to the place from which he removed."

Validity of the service of summons was involved in the McGill Case. It is cited by counsel for appellee in support of the contention that Hillman intended to be-

come a resident of Hot Springs, and that this intent is to be drawn from his conduct and declarations.

The intent is controlling. The chancellor, in weighing the evidence, thought a preponderance supported appellee's declarations of purpose. In considering evidence relating to one's intentions, and weighing its sufficiency, it is necessary to look behind mere physical action and to appraise human behavior. That the chancellor's determination of the issue was one honestly arrived at and sincerely entertained is not to be questioned.

It is our view, however, that appellee sought a new field where he was unknown, and in doing this his motives are to be measured by his interests. Some of the testimony copied in this opinion is not pertinent to a decision other than to illustrate appellee's conduct. To this extent it has a bearing on his probable intentions.

The conclusion is that the move was not made in good faith—that is, with the intention to become a resident of Garland county.

Reversed with directions to dismiss the complaint.