## SMITH *v.* SMITH.

4-9552                                    242 S. W. 2d 350

Opinion delivered July 9, 1951.

Rehearing denied October 8, 1951.

Philip S. Moyer, Rex W. Perkins, and Henry Donham, for appellant.

Clifton Wade, Robert P. Smith, Robert V. Smith, and Beloit Taylor, for appellee.

GRIFFIN SMITH, Chief Justice.    The Chancellor held that appellee was a resident of Arkansas within the meaning of Act 71 of 1931, Ark. Stat's, § 34-1208; and also decreed that as plaintiff Smith was entitled to a divorce under the seventh subdivision of the Annotated Statutes, § 34-1202.    Conceding correctness of the finding that separation without cohabitation had continued for three years, appellant asks that the decree be set aside on the ground that appellee was not a *bona fide* resident. *Cassen* v. *Cassen*, 211 Ark. 582, 201 S. W. 2d 585.

Quite obviously appellee undertook to supply the deficiencies mentioned in *Swanson* v. *Swanson*, 212 Ark. 439, 206 S. W. 2d 169—Joseph Swanson's failure to testify in his own behalf or offer evidence of an intention to make Arkansas his domicile.    In the case at bar appellee did all that the quick use of material resources could supply and that self-serving declarations could

reinforce to show that he moved to Washington county because of its ideal summer climate and geographical location.

We take judicial knowledge of Fayetteville's livability and many of the other advantages emphasized by appellee in explaining the shift from state to state while endeavoring to find a suitable divorce jurisdiction, but we must consider his five-month tenure in Arkansas in connection with former conduct and acknowledged intentions. When this is done the verity of Smith's residential assertions clashes so sharply with the expeditionary motive that Reason supplies the logical answer: a denial of what he asserted in the lower court, and what he contends for here.

Appellee and appellant lived for many years at Camphill, Pa., just across the Susquehanna River southwest of Harrisburg. They were married in December, 1916, and lived together until May, 1945.

Ralph M. Koltze, who said he was comptroller of all of the companies in which appellee is interested, testified that from 60 to 65% of Smith's business was outside of Pennsylvania; that after moving to Fayetteville Smith gave instructions to have all of his mail sent there, saying he intended to make it his home, and in executing official documents Smith gave Fayetteville as his residence.

One of the primary enterprises was L. B. Smith, Incorporated, producing heavy construction equipment "and belts and conveyors for parts." Smith is president of that corporation, the net worth of which "is in the neighborhood" of $2,000,000. He is also president of Keystone Acceptance Corporation, worth $400,000. Mention was made of the Wolf Company. The estimated net worth was testified to by Koltze as being approximately $100,000 to $150,000. He then added, "But the actual worth is doubtful—from my point of view, nothing." Smith was president of Buffalo Gravel Corporation: net worth a million dollars. He was also president of the Hubbard Ford Agency, New York, the

value of which was $90,000; is president of L. B. Motors, Inc., worth $100,000 to $150,000. He had other interests. His salary is $54,000 per year, paid by some of the corporations. In addition, he drew dividends, the aggregate of which was not stated.

Six daughters—one of whom died—were born to appellee and appellant. There were no sons. The five daughters are married. Appellant testified that her husband's attitude began to change in 1943. He made two trips to Mississippi, one to Florida, and perhaps others. Inferences to be drawn from this testimony is that in similar circumstances Mrs. Smith had been asked to accompany her husband, but as early as 1943 he quite clearly did not want her to be with him. While in Camphill Smith would come from the office, leave suddenly without explanation, and sometimes be gone two or three weeks—"he was always in a hurry when he came home." By 1944 his habits were such that his home-comings would not average a day a week—"just long enough to get his laundry."

In May, 1945, appellant called Smith at his office and asked him to take her to a Shrine party. With some hesitation he agreed to do so:—"After the party I saw he was in no condition to spend the night at home, and I asked why. He replied that he was going to a hotel, then began to cry and acted hysterically." In response to appellant's further questions, Smith replied: "I am in so deep now there is no turning back." Appellant finally coaxed her husband to go to bed, but when he left the following morning he said, "I won't be back this evening: I'll be in Washington." Later he packed some personal belongings, then told appellant he wanted her to get a divorce "while I am away." When appellee seemingly became convinced that his wife did not intend to file suit he told her he would take the initiative, adding, "I'm going to do something about it soon."

Throughout appellant's testimony there is the thread of suggestion that he had become involved with Mrs. Vera Chapman. The Washington telephone directory disclosed

that Mrs. Chapman's residential listing was at 4813 Blagden Ave., that Smith listed his office telephone and his residential 'phone at the same address, and that Mrs. Chapman accompanied him on trips.

After remaining in Washington for a year appellee went to Florida. He first rented a house in the village of North Bay Island, then purchased a Miami residence for $82,000 and moved into it. From that time his legal contests were relatively continuous.

He reached Florida in April, 1946, but did not attempt to invoke that state's 90-day divorce law until August 22. After filing the suit he returned to his office · at Camphill, Pa. There process was served on him in a suit instituted by appellant to enjoin prosecution of a divorce action "in any state wherein [Smith] has not acquired a *bona fide* domicile."

Appellant thinks the record clearly discloses that appellee became enraged when this process was served and announced in the presence of witnesses that he did not intend to live with his wife; that he could not be compelled to do so, and that if unsuccessful [in Florida] he would go to another state and bring a different action. These alleged statements, transcribed in a record excluded as incompetent by Washington [County, Ark.] Chancery Court, were testified to by George W. McKee, who said that when process was served on Smith he became "a little excited" and in substance made the declaration it was sought to bring forward from the excluded record. The witness, however, conceded on cross-examination that it was possible Smith did not use the word "divorce," but "he certainly inferred it." The word "action" may have been employed, [said the witness], but the only action contemplated was divorce.

While the Pennsylvania injunction was in effect Smith dismissed his Florida divorce action without prejudice, and in Pennsylvania applied for a dissolution of the injunction. This action was successful, but the court retained jurisdiction upon the theory, no doubt, that fur-

ther consideration would be given the matter if Smith should start a new action in Florida. Shortly thereafter Smith undertook to procure a Florida declaratory judgment of residence. Thereupon Mrs. Smith filed a supplemental bill in the Pennsylvania case in which she sought to restrain her husband from prosecuting the Florida litigation. A restraining order was issued. On July 3, 1948, Smith filed a second divorce suit in Florida. A supplemental bill was then filed in Pennsylvania, resulting in a temporary restraining order. Smith answered the second supplemental bill in Pennsylvania. On final determination the trial court found that appellant (Mrs. Smith) had not sustained the burden of proof necessary to show that her husband had not established a Florida residence. On appeal the lower court was affirmed by a divided court in a decision handed down January 17, 1950. *Smith* v. *Smith*, 70 Atl. 2d 630, 364 Pa. 1. The opinion found that Smith was a resident of Florida, enumerating the conduct thought sufficient to justify the holding. A paragraph in the opinion reads as follows:

"Plaintiff contends that defendant, in moving to Florida, was motivated solely by the desire to obtain a divorce and bases that contention on the undisputed evidence of his adultery. It is true that continuous adultery with one woman tends to show that he wanted a divorce in order to marry that woman. . . . And since motive may reflect on a person's intent to change domicile, . . . his evidence of that intent must be subjected to close and careful scrutiny. Even after such an examination we have no difficulty in finding that whatever may have been the defendant's motive in moving to Florida, he has, on this record, established his intent to make that state his domicile. . . . Plaintiff also complains that defendant's declarations of intent to stay in Florida were self-serving and should have been excluded. Statements tending to show intent are admissible in evidence, although self-serving. But such oral declarations are of but little probative value without corroboration. For that reason evidence of a person's acts and writings are given greater weight than his declarations."

In a dissenting opinion Mr. Justice STEARNE said: "Curiously enough, while his true motives are sharply in issue, [Smith did not] testify in court even by deposition. He relies upon what he is alleged to have told others, who in turn testified as to defendant's intent. . . . In my opinion, defendant's pretended change of domicile from Pennsylvania to Florida, in the circumstances of this case, constitutes a fraud and a sham."

After proving to the satisfaction of three courts—a trial court in Pennsylvania and that State's Supreme Court, and to a Dade County (Fla.) trial court—that he was a *bona fide* resident of Miami; after investing $82,000 in a home, joining clubs, promoting business enterprises, declaring the intent to vote, and executing contractual documents subsequently used as evidence of a state of mind at the time they were signed, Smith suddenly concluded (about thirty days after the Florida court ruled that he had no cause for divorce)—very suddenly, after adopting the Everglade State for social, business, and domestic purposes and spending approximately three years building a record with documentary memorials attesting the intent, Smith left Florida with less ceremony than he employed in entering it and asks us *de novo* to believe that the change was without ulterior motive. It is in evidence that appellee consulted an Arkansas friend, and it is a fair inference he was informed by attorneys that Arkansas is a primary State where the lawmaking authority has authorized an offending spouse to divest himself or herself of an unwanted mate on the sole ground that there had been separation without cohabitation for three years.

Appellant regards as significant (and we concur in the view) that when Smith went to Fayetteville he was accompanied by two attorneys—each highly reputable—one a resident of Arkansas, the other a Washington lawyer. This occurred on Saturday, May 6th. On the following Monday Smith went to a local bank and opened an account. The Washington lawyer had been one of his regular attorneys in the Pennsylvania and Florida

litigation. Smith explained to the Fayetteville court that the attorneys' presence was "a mere coincidence."

Appellee did most of his traveling by airplane. Advantageous purchases of large government planes [said the witness] offered opportunities for reconditioning and reconversion in a plant be directed. Fayetteville was looked upon as a centrally located point from which he could radiate in contacting executives of large industries who might be interested in private air travel. Two or three sales were mentioned, one in this state. Smith very promptly joined the Chamber of Commerce and the Country Club. He first registered at the Washington Hotel, then changed to Mountain Inn where he remained until June 10. At that time he leased an apartment and moved into it. The divorce suit was filed July 18, 1950, and tried October 4. The decree was signed three days later. An attorney's fee of $1,500 was allowed the defendant.

We have not overlooked the oral statements made by Smith regarding his intention to make Arkansas his home; nor have the transactions evidenced by documents been minimized. He bought Arkansas Stadium bonds, purchased a residential lot and said he intended to build on it, supplied testimony that he spent half of his time in Fayetteville, maintained a cabin plane and employed two pilots—one of whom "gave up" his leased home in Florida and purchased a residence in Fayetteville where he was joined by his wife and four children, and the other pilot moved some of his household belongings to Fayetteville.

Although Smith's affirmative behavior and his personal acts within this state, standing alone, would satisfactorily show an intention to remain here, this course cannot be separated from what has concededly been his plan for several years. In Florida he was certain that the state's advantages, as distinguished from a personal purpose to repudiate the matrimonial contract, motivated and activated abandonment of Pennsylvania and Washington. In view of the Florida judgment and the Pennsylvania Supreme Court opinion that the certainty

Smith professed was a factuality, it is definitely established that Florida *was* his home; but in spite of this transcript evidence of good faith in dealings touching Florida justice, we find appellee doing (in effect) exactly what he told the Pennsylvania process-server he would do: keep on trying in different states until the unoffending mother of his six children had been dealt with in a manner satisfactory to his desire for legal freedom from all matrimonial pledges.

Our conclusions are that appellee did not have a *bona fide* intent to reside in Fayetteville, hence the decree must be reversed. All costs will be adjudged against appellee. In addition, $2,500 supplementary to allowances already made will be awarded as attorneys' fees.

Holt, J., dissenting. It is conceded that the parties here have lived separate and apart for three years (approximately six years in fact) without cohabitation and, therefore, appellee would be entitled to a divorce in Arkansas if he had established the jurisdictional prerequisite here of residence at the time suit was filed and the decree granted. The only question before us, therefore, is that of residence, a fact question.

The chancellor found that the preponderance of the evidence showed that legal residence had been established, and on this appeal, where we try the case *de novo,* I am unable to say that the trial court's finding was against the preponderance of the testimony and, therefore, I think we should affirm.

At the time appellee.moved to Fayetteville, I think he abandoned his Florida residence. He, therefore, had the absolute right to establish his residence in Arkansas. His intention is controlling, *Hillman* v. *Hillman,* 200 Ark. 340, 138 S. W. 2d 1051. No definite length of time is necessary in order to establish domicile or residence. "Under the common law every person has a domicile; when any person attains his age of majority he at that moment has a domicile previously assigned to him by law. He may thereafter acquire a new domicile, but if he does not acquire a new one the old one persists.

"The principal manner by which a new domicile can be acquired is by physical presence at a new place coinciding with the state of mind of regarding the new place as HOME. New domicile arises instantaneously when these two facts concur. The motive actuating establishment of the new home is wholly immaterial. It may be for the purpose of taking advantage of lower tax laws, or easier divorce laws, or to evade civil or criminal liabilities about to be imposed in another state, or for any other purpose, worthy or unworthy. If presence at the new place is with the intention merely to make use of the more favorable laws there in force or gain other advantages there available without actually making a new and exclusive home at the new place, no domicile is there acquired. Presence at the new place need not have continued for any particular length of time in order to establish a new domicile, . . . ," Leflar, Conflict of Laws, Arkansas, p. 70, § 13.

We said in *McGill* v. *Miller*, 183 Ark. 585, 37 S. W. 2d 689: "It must be remembered that a man has the absolute and unqualified right to change his place of abode when he pleases, for any reason which prompts him so to do, and that he does change his place of abode when he removes from one place, with the intention of abandoning it as his place of abode, to another place, where he expects to abide, without having the intention of returning to the place from which he removed." And in 28 C. J. S. 17 the textwriter uses this language: "If the requisite intention is shown to exist, the law will not, according to most authorities, scrutinize the motive or purpose prompting a change of domicile; . . . ," and in support of the text is cited *Hillman* v. *Hillman*, above. And in Restatement of the Law, Conflict of Laws, under Domicile, Chapter 2, § 22 it is said: "a. If the new dwelling-place is acquired with the necessary intention of making it a home, it becomes a domicile of choice although there may be a special, even an unworthy, motive in making the change.

"1. A changes his dwelling-place for the purpose of diminishing his taxes or avoiding the payment of a debt

or for the purpose of securing a divorce. He intends, however, to make the new place his home. A's domicile is changed.''

With these guiding rules in mind, I consider the evidence. Appellee in April, 1950, closed his house in Florida, placed it for sale with an agent, publicly advertising it. May 5, 1950, he moved bag and baggage by private plane to Fayetteville, closed his bank account in Florida and directed federal authorities to change his income tax file to the office of the Collector of Internal Revenue in Little Rock and notified taxing authorities in Florida of his move to Fayetteville. He removed his name from the voting registration list in Florida, and notified social and fraternal organizations, clubs, insurance companies and hotels where he had credit cards of his change in residence to Fayetteville, at the same time resigning his membership in the Miami Beach Country Club. After arriving in Fayetteville he opened bank accounts and safety deposit boxes at the McIlroy Bank and at the First National Bank of Fayetteville, informing the bank officials that he had come to Fayetteville to make it his home. He joined the Fayetteville Country Club and its Chamber of Commerce, opened a business office and employed a secretary. He purchased an Arkansas poll tax June 8, 1950, and leased an apartment for a year. After some investigation he purchased four acres of land adjoining the country club at $1,500 an acre on which he contemplated building a home at the cost of $50,000. It is practically undisputed that Fayetteville is the center or hub of his various and extensive business enterprises.

Of strong significance and supporting my view that appellee intended to establish his domicile in Fayetteville and abandon his Florida residence was the undisputed fact that the skilled and trusted pilot of his private plane who had served him faithfully for many years, moved his family (his wife and three children) and all his belongings, from Florida to Fayetteville, placed his children in school in Fayetteville and purchased a home for $10,000 (paying $4,000 cash and $6,000 through a Fay-

etteville building and loan company), and the further fact that appellee's co-pilot also moved his family to Fayetteville and leased a home. It seems to me that these actions of appellee's pilots when considered along with all the other evidence were sufficient to turn the scales in favor of the chancellor's findings when the evidence appeared to be so evenly divided. Obviously appellee must have a domicile somewhere. The rule, as pointed out, is that one may change his domicile at will, with no certain length of time required to effectuate the change. Intention controls.

I make no defense of appellee's moral concepts. It is conceded, however, that he has a valid ground for divorce here and it is also undisputed that appellant (his wife) has property of the value of $350,000 and, in addition to the income from it, appellee pays to her $500 monthly. I would affirm the decree.

I agree with the majority that appellee should pay to appellant's counsel an additional attorney's fee of $2,500.

Justices MILLWEE and ROBINSON join in this dissent.